```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
   PLAINTIFF,                    )      CASE NO. 2:14-CR-127
                                 )
        vs.                      )      NOVEMBER 29, 2016
                                 )
JOHNATHAN HOLT,                  )      1:30 P.M.
                                 )
   DEFENDANT.                    )
_____)
```

**VOLUME III OF VIII**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  KEVIN W. KELLEY
     DAVID A. DEVILLERS
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215



FOR THE DEFENDANT:

Golden & Meizlish Co., LPA
By:  KEITH E. GOLDEN, ESQ.
     ADAM H. KARL, ESQ.
923 East Broad Street
Columbus, Ohio  43205


                            - - -

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

        SHAWNA J. EVANS, OFFICIAL FEDERAL COURT REPORTER
         85 MARCONI BOULEVARD, COLUMBUS, OHIO  43215
                        614-719-3316

VOL. III - 292

1              TUESDAY AFTERNOON SESSION

2              NOVEMBER 29, 2016

3                    - - -

4         THE COURT:  Ladies and gentlemen, I hope you had ample

5    time to do more than simply inhale your lunch.  Usually we'll

6    have about an hour from now on, once you have found your

7    bearing.  But, if that is not enough time, I want you to let me

8    know and we'll work around your schedule, within reason.

9         As I indicated, we're going to begin now with the

10   presentation of the case of United States versus Johnathan

11   Holt, and we will first hear from Mr. DeVillers with opening

12   statements.  I will caution you, again, that opening statements

13   are not evidence but rather the lawyer's view of what the

14   evidence will show.

15        Mr. DeVillers, are you ready to proceed?

16        MR. DEVILLERS:  I am, Your Honor.

17        THE COURT:  Please proceed.

18        MR. DEVILLERS:  Thank you.

19        Good afternoon.

20        So in most cases, in most trials, there's one defendant.

21   And in this case in front of you, there is one defendant.

22   That's Mr. Holt.  But to understand this case, and a lot of

23   racketeering cases -- and this is a racketeering case, you're

24   going to hear about -- is you also have to understand some

25   aspects about an enterprise.  And the enterprise in this case

VOL. III  -   293

1   is the Short North Posse.

2        I'm going to talk briefly about the Short North Posse.

3   As said in voir dire and throughout this case and through

4   stipulations so far, the Short North Posse was a criminal

5   enterprise.  It was a gang in the Short North area of Columbus,

6   at least that's where it started and expanded.  It's more akin

7   to a tornado that left wakes of bodies in its path not just

8   here in Columbus, not just in this community, but throughout

9   Ohio.

10       This enterprise engaged in drugs, drug sales, murder for

11  hire, killing of witnesses, extortion.  But its bread and

12  butter was robbery, home invasions, the vast majority of which

13  were of drug dealers, other drug dealers, rivals.  In some

14  aspects, difficult targets because drug dealers are armed.  But

15  in other ways, easy targets because, if everything goes right,

16  that drug dealer isn't going to report being robbed.

17  Unfortunately, a lot of times it doesn't go right.

18       And this enterprise, the Short North Posse, this

19  tornado, if you will, got stronger and stronger with the

20  members that joined it and got more destructive and more

21  destructive with the members that joined it.  From 2005 to a

22  little after 2010 was the high point.  And you're going to hear

23  through evidence at about 2010, it lost a lot of its members.

24  It lost its members through being killed.  It lost its members

25  through being arrested for various crimes.

VOL. III — 294

1    Some of those people —— and it's going to be stipulated

2    to that this enterprise exists.  It is something that the judge

3    has instructed you the parties agree that this enterprise

4    exists.  The question is the association of the defendant and

5    others with this enterprise, with this gang.  You're going to

6    hear about some of the people who are actually members of this

7    gang.  You're going to hear about a Joseph Hill, Deshawn Smith

8    and Andre Brown, who goes by Paco, and Ishmael Bowers and, most

9    importantly, Lance Reynolds, all of whom were indicted along

10   with the defendant in the superseding indictment, and others.

11    In 2010, Holt was and —— never has been a member of the

12   Short North Posse.  He is not from the Short North.  He's from

13   kind of the near east side of Columbus, as is another young man

14   by the name of Christopher Wharton.  Christopher Wharton and

15   Johnathan Holt were friends.  They were young men.  I think, as

16   stated in the voir dire, the defendant was about a month away

17   from being an adult when this was committed, this murder.

18    And they wanted to make money.  They wanted a different

19   lifestyle.  And as happenchance took place, a person by the

20   name of Daryl Wharton introduced Christopher Wharton, who was

21   Daryl's —— Darryn's little brother —— and Holt to a person by

22   the name of Lance Reynolds.  You're going to hear a lot about

23   Lance Reynolds.  Lance Reynolds was a member of the Short North

24   Posse and a professional robber.  That's what he did for a

25   living.

1           He met up with the young Mr. Holt, the young

2     Mr. Reynolds -- or young Mr. Wharton, along with a person by

3     the name of Paco who was Andre Brown, and Ishmael Bowers who

4     also goes by Chaz, all members of the Short North Posse who

5     committed robberies.  They wanted in.  They wanted to be part

6     of these robberies.  They wanted to make money.  And Lance

7     Reynolds was more than happy to let them.  Why commit robberies

8     yourself when you can get guys to do it for you?  Reynolds was

9     much older than these guys.  He was experienced.  He was going

10    to use these guys.  And he did, and someone died because of it.

11          It started off, as we've already said, the Short North

12    Posse were good at hitting drug houses.  It started off using

13    Mr. Wharton and Mr. Holt and also a gentleman by the name of

14    Dreke.  You'll hear about him.  His name is Roddriccos Kenney,

15    another young man.  They robbed grow houses.  What do I mean by

16    grow houses?  Grow houses are weed houses where people actually

17    hydroponically plant marijuana using lights and water systems,

18    and they usually have money in there.  And they went in there

19    and robbed those houses of the plants, sometimes the lights and

20    any money they could get.

21          People don't report being robbed of your marijuana or

22    your drugs, and that's how it went at first.  It went

23    relatively well at first, relatively without incident at first.

24    This is all in a brief period of time, from late 2009 to early

25    2010.

1          They graduated to doing a robbery of a store, a store

2     called Family Dollar.  And this is in the later parts of 2009.

3          Lance Reynolds scoped it out.  He thought it would be an

4     easy hit, easy lick is what they call robberies – licks – and

5     had the defendant with a gun, Mr. Wharton with a gun, drove

6     them out there, told them what to do.  They wore hoodies and

7     some masks and went in there to rob the place.

8          You're going to see a video of that robbery.  Mr. Holt

9     pointed a gun at the teller, demanded money.  There were a lot

10    of people in there.  There was some confusion.  They ended up

11    running out.  Didn't get any money.  Ran back to Reynolds, to

12    where he was waiting for them, got in the car and drove away.

13         A few months later, a few days before March 24th, 2010,

14    Lance Reynolds and Ishmael Bowers scoped out another spot,

15    another drug house, another weed house.  And that house

16    belonged to Quincy Battle.

17         Quincy Battle was a marijuana dealer in the Poindexter

18    area of Columbus; specifically, 1382 Phale Hale Drive.

19    Poindexter is a pretty rough area.  He didn't deal in large

20    amounts, didn't leave his house very often.  People came there.

21    He was a bit of a homebody, had been robbed in the past, was

22    careful, had a core group of customers.  You're going to hear

23    about that.  A young lady by the name of Donicqua Ingram was

24    his girlfriend, 17 at the time.  She would stay at his house

25    from time to time, as would a guy by the name of William Moody

1    who, for lack of a better word, was a crackhead.  He was

2    addicted to crack cocaine.  He would live in that house from

3    time to time and do work for Quincy Battle; serve people at the

4    door when Mr. Battle wasn't there.  He would also serve people

5    marijuana.

6          As I said, Mr. Bowers and Mr. Reynolds were scoping out

7    the place.  They watched who was coming, who was going.  They

8    are pros.  They've done this in the past.  You're going to hear

9    about that in a little bit, that they've done it in the past.

10   They know what they're doing.  They're only going to hit places

11   where they think they can get something, and they thought they

12   could get something there.  They've killed before.

13         In the evening of March 24th, Mr. Reynolds texted

14   Christopher Wharton, Mr. Holt's young friend, and says, I got a

15   job.  So Mr. Wharton, Mr. Holt, and a person by the name of

16   Roddriccos Kenney, who also goes by Dreke, met up at a house

17   they often met at off of 22nd Street here in Columbus; again,

18   kind of the east side.  Kenney didn't have a gun but Mr. Holt

19   did.  He had a .22-caliber pistol.  And this pistol was

20   purchased at Vance's Gun Shop here in Columbus about a month

21   before not by Mr. Holt.  He was a juvenile.  By a person by the

22   name of Carl Nelson.  Carl Nelson and Mr. Wharton and Mr. Holt

23   all knew each other.  And Mr. Holt asked Mr. Wharton to buy it

24   for him; he would pay him.

25         You're going to hear from Mr. Nelson who bought the gun.

VOL. III - 298

1  You're not going to like him.  He's got prior convictions.  He

2  bought a gun for somebody, for a juvenile.  But you're going to

3  hear from him.  We ask you to listen to him.

4          Christopher Wharton had a revolver.  He had a

5  .38-caliber revolver.  The .22 caliber was a semiautomatic

6  pistol that Mr. Holt had.  The plan was for Mr. Wharton to go

7  in with -- and Mr. Holt to go in with money to see what was in

8  there.  Once the door was open, a 50-dollar bill to buy the

9  weed, and then everyone else would rush in; that is,

10  Mr. Reynolds and Mr. -- Dreke, Mr. Kenney, with the defendant

11  and Mr. Wharton.

12          That's not exactly what happened.

13          They went in, knocked on the door.  Mr. Moody opened the

14  door.  The victim, Mr. Battle, was in the back room with his

15  girlfriend.  He came out to serve them the marijuana.  The

16  defendants drew their guns -- that's Mr. Holt and Mr. Wharton.

17  Mr. Battle grabbed for Mr. Holt.  Mr. Holt and Mr. Wharton both

18  shot and killed him.  The defendant fired once.  Mr. Wharton

19  fired twice.  Both -- all three bullets entered the victim.  He

20  died a short time later.

21          They ran, they left, they got back into Mr. -- Reynolds

22  was driving a van, Mr. Holt was driving another car.  They went

23  back to 22nd Street.  They got nothing.  In fact, they left the

24  50-dollar bill on the ground.  They also left a shell casing.

25  The shell casing is a -- there's a bullet and there's a shell

VOL. III - 299

1    that's attached to the bullet.  The bullet goes out the barrel.

2    And with a semiautomatic pistol, a shell casing is ejected,

3    automatically ejected.  With a revolver, there is a cylinder,

4    and the shell casings stay in the cylinder until later on you

5    empty the shell casings.  Mr. Holt's shell casing was left at

6    the scene.

7          At that point, things slowed down for a little while.  A

8    man's murdered.  They know it.  Mr. Holt gets rid of the gun

9    but makes a mistake.  He doesn't destroy the gun.  You're going

10   to hear evidence of guns throughout this case, guns being

11   passed around all the time.  But traditionally, when a gun is

12   used in a murder, it's destroyed.  This one was not.  It was

13   passed around for a while until eventually recovered by CPD,

14   Columbus Police Department.

15         We'll get to that.

16         A few months after Mr. Battle's murdered, the defendant

17   Mr. Holt is shot in the back and paralyzed from the chest down.

18   That's why he's in a wheelchair today.

19         Mr. Wharton was not shot.  He continued doing robberies

20   and home invasions with his crew of people.  Paco who is Andre

21   Brown, Lance Reynolds, his brother, and Chaz who is Ishmael

22   Bowers, they rob, they shoot people.  Fortunately, from that

23   time on, no one dies from them, but they could have easily,

24   until 2012.  And in 2012, Darryn, who is again Christopher

25   Wharton's older brother, and Ishmael Bowers go to steal some

VOL. III - 300

1    rims out of a garage.  They hit the wrong garage because the

2    person in that house shot Darryn in the face with a shotgun.

3    He lived, barely.  Severe brain damage, can't walk, can't talk,

4    eats through a straw.  He is an invalid, needs 24-hour,

5    seven-day-a-week attention.  Then it did finally slow down for

6    Mr. Wharton.  He was taking care of his brother.  He had to,

7    until 2014.  In 2014, Mr. Holt, Mr. Wharton, Mr. Bowers,

8    Mr. Reynolds, Andre Brown, their lives came to a halt.

9            Back up a little bit.

10           We've heard about the Short North Posse.  In 2012 a task

11   force was put together with the FBI, ATF, DEA, the Columbus

12   Police Department.  There are two major indictments.  One

13   indictment involved pretty much just drugs, taking down people

14   in 2011, about 20 something people.  Cocaine, heroin, pills.

15           In 2012, that investigation turned to the violent

16   aspects of the Short North Posse.  You already heard a little

17   bit about that violent aspect.  Some subsets within the Short

18   North Posse - Cut Throat Committee and Homicide Squad - were

19   men that would go around robbing drug dealers, often shooting

20   them, killing witnesses, intimidating people, who were

21   enforcers for the Short North Posse, would take the drugs back

22   and supply the Short North Posse's drug dealers to sell.

23           And as you know, five of them went to trial, the major

24   ones, earlier this year.  That indictment came down in July of

25   2014.  And in that indictment was also Mr. Bowers and

VOL. III - 301

1    Mr. Reynolds.  There were 17 people indicted, something like 12

2    murders and hundreds of overt acts, hundreds of other crimes

3    within it.  And Mr. Bowers and Mr. Reynolds were part of that

4    indictment.

5         Once these people were arrested in July of 2014, other

6    information started to surface about other individuals that

7    were associated with it, about other murders that took place.

8    One of those murders was the Quincy Battle murder.  The

9    investigation shifted to those murders including the Quincy

10   Battle murder.

11        That murder was already assigned in 2010 to a homicide

12   detective named Bill Gillette.  You're going to hear from Bill

13   Gillette.  It went cold for a long time.  No one could identify

14   anybody being involved with it.  But that shell casing -- there

15   is this thing called NIBEN.  NIBEN is a computer system.  And

16   any time there's a murder or a violent crime of some sort and

17   shell casings are left on the scene, those shell casings are

18   picked up and put into this system by the Columbus Police

19   Department and ATF and put in a computer, and microscopic

20   pictures are taken in case a weapon is ever found.

21        About four months after the murder of Battle, a weapon

22   is found, a .22-caliber pistol.  That pistol is fired into some

23   water by a person that does that.  The shell casing is taken

24   from the gun and is put in the NIBEN system.  That NIBEN system

25   searches the database for any other shell casings that may have

VOL. III – 302

1    been fired from that gun.  In this case, there was a hit.  And

2    the hit was that shell casing left by this defendant at the

3    Quincy Battle murder.

4         Now, agreed, these guns get passed around a lot.  And

5    this gun was recovered about four months later by a male --

6    white Hispanic man.  The gun was taken -- the suspects in this

7    case were African American.  That's about all anyone could say

8    from being at the scene.  But the gun was traced back and it

9    was traced back by being purchased at Vance's.  The serial

10   number on that gun was purchased at Vance's Gun Shop by Carl

11   Nelson in February of 2010, a month before the murder of Quincy

12   Battle.  That's what we have.

13        So we went calling for Carl Nelson, sent a grand jury

14   subpoena to him.  In August 18th, 2014, he came to this

15   building, fourth floor of this building.  No idea why he was

16   coming, no idea why he was subpoenaed and there was myself,

17   Mr. Kelley, Agent Lauber, agents from DEA and ATF, and he was

18   being interviewed about a firearm that he purchased at Vance's.

19        He wanted to know a little bit more information.  He was

20   told that the gun that he purchased at Vance's in February of

21   2010 was used in a murder.  And he almost passed out.  He

22   almost fainted.  He was terrified.  He said that he provided

23   that gun to a person by the name of Holt -- or rather, Dough

24   Boy, or Johnathan, that he knew from his neighborhood.  The

25   defendant's nickname is Dough Boy.  Later on, Mr. Nelson picks

VOL. III  -  303

1  him out and identifies him as the person that he provided the

2  gun to.

3       Now, he did not tell us in August of 2014 that he went

4  to Vance's, bought it for him specifically.  He said that he

5  bought it and later on they traded guns, or they traded guns in

6  the past, and it was a gun trade.  Now, the reason he told us

7  that is because it's illegal to go to a gun store and buy a gun

8  for somebody.  He lied to us, but he did say he provided that

9  gun to Mr. Holt.  The next time we talked to him, which was

10 only about a month ago or so, Mr. Nelson, he came and admitted,

11 admitted he lied, he admitted he was afraid, and he admitted

12 he, in fact, did buy that gun specifically for Mr. Holt.  And

13 Mr. Holt picked it out from Vance's and he went and bought it

14 for him.  You're going to hear from Mr. Nelson.  You're not

15 going to like Mr. Nelson.

16      Let's talk a little bit about Mr. Bowers.  As I

17 indicated, Mr. Bowers was in the original indictment of those

18 17 Short North Posse individuals, committed lots of robberies.

19 One in particular that we knew about, that was of the gentleman

20 by the name of Shane McCuen.  In 2007, himself, Ishmael Bowers,

21 Lance Reynolds, a guy named Deshawn Smith and Joseph Hill went

22 to Zanesville, Ohio, to rob Shane McCuen.  He was a marijuana

23 dealer.  They didn't go to kill him.  But they went there to

24 rob him.  In the course of robbing him, Lance Reynolds shot and

25 killed him, shot his dog and then killed Shane McCuen.  Ishmael

VOL. III - 304

1    Bowers was indicted for that, as was Joseph Hill, Deshawn Smith

2    and Lance Reynolds, indicted for murder in the aid of

3    racketeering, the exact same charge that Johnathan Holt is

4    facing here today.

5         Now, you may say, well, he didn't shoot or kill him.

6    But, as it was discussed with you, and as the judge will

7    instruct you about, conspiracy and aiding and abetting and,

8    specifically, one of the instructions we expect you'll get that

9    if people conspire to do something, commit a crime, in this

10   case, robbery, and it's reasonably foreseeable that one of the

11   co-conspirators would commit a crime such as going in with a

12   loaded gun and killing somebody during a robbery, then you're

13   responsible for those foreseeable acts as a co-conspirator.

14   That's why Ishmael Bowers was indicted for and has pled guilty

15   in this courtroom in front of this judge to the murder of Shane

16   McCuen.

17        He did so and he agreed to cooperate.  He agreed to

18   cooperate against Lance Reynolds, against the people from the

19   first trial, from Mr. Holt, from anybody else.  And in August

20   of 2014, about a week after we talked to Mr. Nelson, he came

21   in, admitted to the crimes he committed that he's been indicted

22   for already, came in with his attorney and we did a proffer.

23   You're going to hear about a proffer.  Now, a proffer is an

24   agreement.  It's an agreement between the prosecution, the

25   defendant and his attorney, defense attorney.  It's an

VOL. III - 305

1   off-the-record conversation.  We have a piece of paper, it's

2   written.  I sign it, the defense attorney signs it, the

3   defendant signs it and it says we can't use what you say

4   against you.  It doesn't give him complete immunity.  We can

5   find other ways to get him, but we get to hear about what they

6   said.  We do that in cases where we have somebody like

7   Mr. Bowers who is already facing murder and we have reason to

8   believe he has information that can solve other murders of

9   other people.  And we did.  You may not like it.  You don't

10  have to.  But that's what we did, that's what we do.

11      He came in and told us, he told us about what he knew

12  about the Quincy Battle murder plus other robberies that he

13  committed with these other individuals over the years.  Wasn't

14  charged with the Quincy Battle murder.  He's guilty of the

15  Quincy Battle murder.  He wasn't there.  We're not suggesting

16  he was.  But remember, he was there with Lance Reynolds

17  planning.  It turns out that he was up north with a girl at the

18  time and didn't go on this murder, on this robbery.  But he's

19  just as guilty as if he was there.  He helped plan it.  It's

20  reasonably foreseeable that they would rob him with guns and

21  someone died because of it.  But he's not being charged with

22  it.

23      About a week after that, we call in Mr. Holt, the

24  defendant.  Give him a grand jury subpoena, ask him to come in

25  and talk to us, ask him to come in specifically to get his

1   picture taken.  The last picture we had was a long time ago.

2   We want to show it to people, also to get a DNA swab in case

3   there's any DNA evidence.  He came in and did that.  Came in

4   voluntarily, didn't know why he was coming in.  He was free to

5   leave.  Wasn't charged with anything.  We asked him some

6   questions.  Detective Bill Gillette was there from homicide.

7   Agent Lauber was there.  A couple other agents were there.  I

8   was there.

9        Now, at this point, we didn't know a lot about what

10  exactly happened because, remember, Ishmael Bowers wasn't there

11  and neither was Nelson during it.  But we know that the gun

12  went to him.  Asked him about that.  Asked him about the gun.

13  He denied -- he said he knew Nelson, denied ever getting a gun

14  from him.  He said he knew Lance.  Showed him a picture of the

15  gun, the .22.  He said, Well, that looks like a gun that Lance

16  might have.  Asked him a little more about Lance.  Asked him

17  about the .22.  Then he started to talk a little bit more.

18  Talked about the spot over at 22nd Street where Lance Reynolds

19  would meet up and do things.

20       His first story was that Lance Reynolds asked him to go

21  do some recon for him, to go to a house, Quincy Battle's house

22  in Poindexter, and buy some marijuana.  So he did.  He said he

23  went there, dropped him off, got inside, bought some marijuana,

24  went back to 22nd Street where Lance was, where Darryn was,

25  where Ishmael Bowers was, and told them what he found and what

VOL. III - 307

1  he saw.  He said later on Lance told him that they went to do

2  the robbery and Quincy Battle was killed.  Denied being there,

3  denied going there during the robbery.  He also admitted

4  knowing Chris Wharton and knowing Roddriccos Kenney but said

5  they had nothing to do with it.  That's his first story.

6       Talked to him a little bit more, didn't really add up

7  about the gun.  Asked him if he had anything else to say.  He

8  put his hands in his face, rocked back and forth for a little

9  while, looked up and said, Now I'm going to tell you what

10 really happened.

11      This is his second story.  Said that Darryn, Lance

12 Reynolds, Dreke, or Roddriccos Kenney, Paco, who is Andre

13 Brown, Bowers, and Chris Wharton all went over to Quincy

14 Battle's house earlier in the day in Lance's van.  The plan was

15 for Holt to do a -- to buy weed and see who was in there.

16 Knocked on the door, bought the weed, went back to 22nd Street

17 with the whole crew, told them about what happened, got a lay

18 of the land and then they went back to do the robbery.

19      This time Chris Wharton he's saying went, Dreke went,

20 Bowers went, Lance Reynolds went, and Darryn went.  No Paco

21 anymore.  Andre Brown didn't go this time.

22      The plan was for Holt and Lance to go to the door and

23 then, when they opened it, everyone was going to rush in and

24 rob him.  He said that that's what happened, that Lance and he

25 went to the door and as the door was opened and as it was

VOL. III - 308

1  answered, Lance, Dreke, and Bowers busted in.  He says he ran

2  out and heard shots.  They all went back to the place,

3  22nd Street.  Nothing was taken.

4       He also admitted that he did, in fact, buy that .22

5  caliber or get that .22 caliber from Carl Nelson.  He admitted

6  to getting it at Vance's from Carl Nelson, the same gun that

7  was used in the murder.  But, for some reason that was never

8  actually explained in detail, Lance had that gun and Lance is

9  the one that shot and killed Quincy Battle; not him.  Don't get

10  me wrong, Lance is a killer.  Lance is as guilty as

11  Mr. Wharton, as Dreke, as the defendant, as Mr. Bowers.  They

12  all planned this.  They all were involved one way or another.

13       But the evidence is going to show, the evidence does

14  show, that only two people went into that room that day and

15  fired their weapons.  That was the defendant and Mr. Wharton.

16  And Mr. Wharton is going to come in and tell you that.

17       Not long after we talked to the defendant in September

18  of 2014, called in Mr. Wharton, told him what was going on,

19  told him what we knew, he wasn't in jail.  He wasn't locked up,

20  was free to go.  He was told he better go get an attorney, come

21  back and talk to us.  He did.  Came back on October 3rd, 2014,

22  with his attorney, told us another story relatively similar:

23  Goes in there to do the robbery but he doesn't shoot either.

24  At least he doesn't shoot the defendant.  He shoots in the air

25  and runs out and doesn't know what happened.

VOL. III - 309

1    He was told that didn't add up and he decided he wanted

2    to come back with his attorney later on.  About a week later,

3    he came back with his attorney and did a proffer and admitted

4    to shooting and killing Quincy Battle, admitted firing two

5    shots with that revolver into Quincy Battle, states that he and

6    Mr. Holt went in, planned by Lance Reynolds, and Mr. Holt shot

7    and he shot.  He was charged with - you guessed it - murder in

8    the aid of racketeering, the same thing Mr. Holt is charged

9    with, same thing Mr. Bowers is charged with, same thing

10   Mr. Reynolds is charged with and pled guilty in front of Judge

11   Marbley and also agreed to cooperate, also agreed to testify

12   not just against Mr. Holt, but against everyone for a number of

13   crimes.

14   He also admitted the crimes that he committed later on

15   with these guys after this that Mr. Bowers told us about.  He

16   admitted to that as well.  He said there were so many

17   robberies, so many home invasions.  He doesn't even remember

18   all of them, but he remembers this one.

19   So, Mr. Wharton and Mr. Bowers have pled guilty.

20   They're facing life imprisonment for the murders they

21   committed.  Mr. Bowers for the murder in Zanesville of Shane

22   McCuen and Mr. Wharton for the murder of Quincy Battle.  They

23   didn't get life without the possibility of parole.  They're

24   hoping for something less than that.  They're coming in here

25   and going to tell you what they know and hope that we, that is

VOL. III - 310

1   myself and Mr. Kelley, the United States, files a motion with

2   the judge and asks for a reduction in his sentence.

3        Whether that's granted or not is up to one person.

4   That's Judge Marbley.  If it is granted, we get to make a

5   recommendation on the sentence.  The probation department which

6   works for the court does some calculations, gets to recommend a

7   sentence.  Their defense attorneys get to recommend a sentence.

8   The victims, Mr. Battle's family, Mr. McCuen's family, they get

9   to recommend a sentence.  In the end, how much time each of

10  those men get is up to one person, and that is Judge Marbley.

11       But without us filing that motion, they're doing life

12  without the possibility of parole.  And as Mr. Kelley said,

13  these aren't good people.  They're not coming up to doing this

14  out of the goodness of their heart.  And you can consider that,

15  whether they're credible or not.  You should consider it,

16  whether they're credible or not.  We only ask you at this

17  point, please listen to what they have to say.

18       We talked about murder in aid of racketeering, and the

19  defendant's charged with -- specifically, with the robbery of

20  the Family Dollar and the murder of Quincy Battle.  Within the

21  murder of Quincy Battle, there's two -- there's one murder but

22  two ways that he can be convicted.  One is through using a

23  firearm during and in relation to a drug trafficking crime

24  resulting in death.  The judge is going to instruct you on

25  that, but basically it means taking a gun to try to get drugs

VOL. III - 311

1    to sell.  The testimony is going to be they went there to steal
2    marijuana from him, perhaps money in there.  They wanted to get
3    the marijuana.  They're going to divide it up and distribute it
4    amongst themselves, and someone died as a result of that
5    because of a gun being used.
6           The other one is the violence in aid of racketeering.
7           And I'm going to kind of go over briefly those elements.
8    One is the existence of an enterprise, in this case the Short
9    North Posse.  That's stipulated to.  We're agreeing that that
10   exists.  Also that the activities affected interstate or
11   foreign commerce.  We're agreeing to that, too.  They were
12   dealing in drugs, the Short North Posse.  That's what they did.
13   Drugs travel through interstate or foreign commerce, as do
14   weapons.  The enterprise was engaged in racketeering activity.
15   We're all agreeing to that, too; that is, ourselves and
16   Mr. Holt.  That was all agreed to.
17          Now, the next element is the defendant committed the
18   alleged crime of violence.  In this case, it was murder.
19          Now, we are not saying -- we are not alleging that he
20   went in there with the intent to kill Mr. Battle.  Not alleging
21   that for Mr. Reynolds or -- Mr. Reynolds, Mr. Holt or
22   Mr. Wharton.  They went there to commit a robbery with loaded
23   guns.  And, as a result of that robbery, someone was killed.
24   That's what we're alleging.
25          We also have to prove that the underlying murder, a

VOL. III  -   312

1    crime of violence, was committed for two reasons.  One, as

2    consideration for receipt of or as consideration for a promise

3    or agreement to pay anything of pecuniary value from the

4    charged enterprise, the enterprise in this case being mostly

5    Lance Reynolds, the Short North Posse member.  They went there

6    to get money and drugs.  They were going to get those, divide

7    it amongst themselves.

8         Two, and/or.  They did so for the purpose of gaining

9    entrance to or maintaining or increasing position in the

10   enterprise, in the Short North Posse, as associates of the

11   Short North Posse.  Were they doing it to bolster themselves

12   within -- as an associate of that enterprise?  Either of those

13   two reasons will suffice.

14        Now, as the judge said in his opening statement, what I

15   say isn't law.  What he says is law and he will instruct you

16   later on.  But I believe that is what the Court will instruct

17   you.

18        As I said, we're not alleging that he went there with

19   the intent to kill anybody.  He's not charged with that.  He's

20   not charged with being a member of the Short North Posse.  He's

21   not a leader.  In fact, he is a follower.  To a large extent,

22   he was used by the Short North Posse, as was Mr. Wharton.

23        But in the end, it was their decision to associate with

24   this group.  It was their decision to go do that robbery.  It

25   was their decision to bring loaded guns to do that robbery.

VOL. III - 313

1    And in the end, it was their decision to shoot Mr. Battle.

2    That's what he's charged with.  And that's what we're asking

3    you to consider.

4         The proof in this case is proof beyond a reasonable

5    doubt.  Hold us to that burden.  It's a burden based on reason

6    and common sense.  You're going to hear us talk about common

7    sense from this time forward.  You use common sense in the most

8    important of your affairs.  Every important decision of your

9    life was made using common sense.  Hold on to it.  Use it.

10   Don't throw it away because you're in trial.  Hold on to it

11   harder because you're in trial.

12        Thank you.

13          THE COURT:  Thank you, Mr. DeVillers.

14      (Thereupon, Court and Counsel conferred out of the hearing

15   of open court and off the record.)

16      (Recess taken from 2:18 p.m. to 2:27 p.m.)

17          THE COURT:  Mr. Golden, are you ready to proceed?

18          MR. GOLDEN:  Yes, Your Honor.

19          THE COURT:  Please proceed.

20          MR. GOLDEN:  May it please the Court, Mr. DeVillers,

21   Mr. Kelley, Mr. Karl, ladies and gentlemen of the jury.  You

22   will recall my name is Keith Golden and I represent Mr. Holt in

23   this matter.

24        That was quite an extensive presentation by the

25   government of what their particular case -- they believe the

VOL. III - 314

1   case will show.  As has been explained to you, my

2   responsibility at this point as to whether I need to stand up

3   and speak at this point is optional.  I've decided to go

4   forward.  Unfortunately, my introductory remarks will not be as

5   long and as extensive as those of the government.

6        One of the reasons is, I will make some comments with

7   regards to what I believe the evidence is going to show or not

8   show with regards to the government.  But I really can't tell

9   you a -- what our case is going to be at this point because a

10  lot of that is up in the air at this point.  We are going to

11  wait and see what the government presents.  A lot of times, in

12  cases of this nature, you ultimately don't know what a witness

13  is going to say till the witness comes in and testifies.  So

14  there's going to be a good deal of evidence that we have seen

15  that we can plan for, and there's other things that we don't

16  know.  A lot of that is testimonial evidence.  Okay?  We've

17  seen the hard, tangible things.

18       And I'll comment quite quickly about that and I'll

19  circle back to that a little later.  There's very, very

20  little -- and I don't want to say zero, because someone will

21  hold me to that, but I would say pretty close to very, very

22  little tangible, physical evidence to tie Mr. Holt to any of

23  the alleged criminal acts that the government is charging him

24  with; rather, the bulk, the significant majority of their case,

25  relies on co-defendants.

VOL. III - 315

1      Now, they also have this purported statement that he

2  made that while he doesn't admit to shooting a gun at this man

3  and killing him, does indicate some culpability.  Again, I'm

4  going to circle back around in a moment and talk a little bit

5  about that as well.

6      So hang on to that.

7      Remember, as we talked earlier, the government's

8  evidence that you just heard was rather voluminous and

9  convincing.  But as you swore to in the beginning, you would

10  not make a finding until the very end when you get to vote.  So

11  therefore, there's still a presumption of innocence.  And if I

12  was to ask you to vote right now, you'd have no choice but to

13  vote not guilty.  I just want to remind you of that.  Even

14  though you've heard all the evidence, I'm a little concerned

15  and I don't want you to think, well, we've all heard the

16  presumption of innocence and we're supposed to listen to both

17  sides and weigh all this, all right, we're signed under that.

18  We've heard all the evidence, let's get through it so I can

19  sign the verdict form and get out of here.

20      I assure you that based on what the government has

21  presented, that evidence is going to be quite difficult, that

22  task.  Let's visit some of those things that the government

23  just told you about.

24      First, as you've been explained, we make your job easier

25  where we can, and we stipulate to facts.  That's for

VOL. III - 316

1    everybody's benefit, not just one person or the other.  It

2    streamlines the case, those facts that aren't in dispute.

3         A couple of those I'd like to briefly comment on, the

4    judge read those to you before.  One is that Mr. Holt was not a

5    member of the Short North Posse.  Okay?  And he's alleged to be

6    an associate.  Okay?  And as I indicated to you before - and

7    you'll hear an instruction later - mere association is not

8    enough.  The government's got to show more.  And, obviously,

9    the evidence that you just heard about would be what the

10   government believes gets them over that hurdle or that burden.

11        The second thing is that at the -- Mr. Holt was born in

12   April 1992.  So, when this alleged Family Dollar event occurred

13   and also the Battle murder occurred, he was a juvenile.  You

14   will -- what we'll argue about later what the implication is of

15   that, and you can obviously make your own thoughts about that,

16   but that's a key fact that we've stipulated to and you can keep

17   that in mind from the get-go as opposed to waiting till you

18   hear testimony or evidence.  That's a given as of this moment.

19        Next, that Mr. Holt was shot and the stipulation is he

20   was shot July 30th, 2010.  Keep that in mind.  The government

21   indicated that after the alleged Battle involvement by

22   Mr. Holt, that he participated on an ongoing basis with some

23   other activities with Mr. Wharton, I believe he indicated.

24   Keep that in mind, that as of July, when you consider the

25   government's evidence or you hear the evidence that he was in a

VOL. III - 317

1   wheelchair having been shot after the end of July.  That's four

2   months, four months later, after Mr. Battle was shot.

3          The lastly, that there was some DNA that was recovered

4   from one of the disguises that one of the Family Dollar robbers

5   wore that was traced.  And you'll hear the technology on how

6   that was done, was traced to Mr. Wharton.  There was no

7   physical evidence tying Mr. Holt to the Family Dollar robbery.

8   There was no -- none of his DNA was matched to either of the

9   garments that they recovered.  The evidence will also show --

10  there's a video, but the video you can't tell necessarily who's

11  who.  And there's no identification testimony that the

12  government will present that anybody identifies Mr. Holt, any

13  of the people that were in the store at that time that

14  identified him.

15         So make a long story short, I would submit the

16  government is not going to present any evidence, tangible,

17  physical evidence to tie Mr. Holt to that robbery.  And in

18  case -- I trust some of you have noticed, but just in case you

19  haven't, that's not one of the crimes that he's alleged to have

20  committed that you need to think -- convict him or find him

21  innocent on.  Count 19 and 20 do not include that.  Rather

22  they're described as what we affectionately refer to as overt

23  acts.  They're just other acts that people commit.  It's like

24  part of the forest.  It's one of the trees in the forest, as I

25  explained earlier.

VOL. III – 318

1          So I would indicate that's there.

2          Mr. Wharton is going to be essentially the only one

3    that's going to testify that Mr. Holt went along on this

4    particular robbery and, again, that's -- whether you believe

5    him or not, that's another discussion.

6          At this point, I would submit that the evidence is going

7    to -- that the government's going to present is mainly going to

8    be these defendants who decided to cooperate.  And at this

9    point, you see these desks over here.  There's a reason that

10   it's more than just one desk.  That's when there's more

11   defendants.  And it was just a matter of months that those

12   gentlemen -- and I affectionately refer to them as gentlemen --

13   were sitting at these tables.

14         But today, for purposes of this -- or this week, for

15   purposes of trial, they'll be coming.  They won't be sitting at

16   that table, but they'll be sitting behind that table and they

17   are now witnesses for the government.

18         Now, these people will be testifying, as you heard, in a

19   number of different versions.  They are going to testify

20   different stories.  They're going to give you some stories.

21   You're going to hear some stories that they gave, and they're

22   not going to match at times and they're going to sound kind of

23   bizarre.  At the end of the day, you're going to be asked to

24   figure it all out and determine who is telling the truth and

25   who is not telling the truth.

VOL. III -  319

1          I would submit, listen carefully because there will be

2     evidence -- when I get to cross-examine them, I get to test

3     them and figure out when they are lying, if they're lying, when

4     are they telling the truth, et cetera, et cetera.  I would

5     submit you need to listen to that all carefully because you'll

6     hear -- you'll flush out motives and reasons, and the best and

7     biggest that you heard the government testify to is they are

8     looking to get reduced sentences.

9          These people are facing, that are going to be

10    testifying, are facing what we call life, life.  That means

11    life in prison and they will die in prison.  Parole has been

12    abolished in the federal system.  So, when they get the

13    particular sentence that they're going to get, it's bye-bye

14    forever.  There's only one exit for them out of that prison and

15    it's coming here and testifying for the government, or they can

16    do other cooperation in other related things.  Keep that in

17    mind when you listen to their testimony and consider that

18    substantially.

19         Now, let's talk about for a moment about the interview

20    of Mr. Holt.  You heard of this interview, and there's going to

21    be the Detective Gillette who is going to come in and testify.

22    And he's going to testify based on what his recollection was.

23    Now, this interview was, what, two years-ish ago.  And so he's

24    going to have to testify based on his recollection and, if

25    necessary, he can look at the notes that he typed up, the

VOL. III - 320

1    report that he typed up.  You're going to see evidence when

2    police, all but short of going to the bathroom, have to fill

3    out reports.  And when they interview someone, there'll be a

4    summary.  You will probably not get to see them, but we get to

5    use them.  And, ultimately, that is all we have.  We have

6    Detective Gilette's memory and we have his typed summary.

7         The evidence will also show that that typed summary was

8    not done, like this young lady is doing here, commensurate with

9    when the statement was given.  Rather, the evidence will show

10   that he took notes in some -- a few days later he typed it all

11   up.  Those notes aren't here, and also the evidence will show

12   that there's no tape recording of that interview.  But the

13   evidence will also show that there are some other people that

14   talked to Detective Gillette and theirs was tape recorded, but

15   this one wasn't.

16        So again, we've got Detective Gilette's credibility at

17   issue.  So remember that was one of the reasons why you were

18   asked about measuring policemen's credibility because that's

19   going to be an issue.  Not only is it the credibility of these

20   cooperating people that were sitting in the room but also the

21   credibility of Detective Gillette and also the credibility of

22   Mr. Holt.  Did Mr. Holt say anything and did he -- what exactly

23   did he say?

24        As was indicated at that point by the government, the

25   evidence will show at that point he didn't have a lawyer with

1  him, whereas, remember you heard the government said that

2  somebody else came in with a lawyer and had a lawyer present

3  with them.  So that's important when you consider that, whether

4  that's a confession or -- again, you'll hear that evidence will

5  show that's another version, different than everybody else's

6  version.

7       Now, at this point, the government is asking you to

8  listen to all the evidence and at the completion of the

9  evidence, they've submitted that all of the ingredients for the

10 cake that I told you that's going to be baked is going to be

11 present.  I can't emphasize more than what I'm going to do

12 right now.  You've all heard -- it applies in grocery stores,

13 where they put McDonalds, you hear location, location,

14 location.  You hear that.  I'm going to tell you reasonable

15 doubt, reasonable doubt, reasonable doubt.  That is a very,

16 very significant issue here.  That is what my job is going to

17 be, to test the government.  And that's what I would submit

18 your job is.

19      And I would submit to you that whether you feel or not

20 Mr. Holt is guilty or innocent, that's not the question.  The

21 question is whether the government has met all of its burden on

22 each and every element beyond a reasonable doubt.  And I would

23 submit to you that, at the end of the day, the government will

24 not be able to do that.  And you will have, essentially, no

25 choice but to go to your verdict forms and sign the verdicts of

VOL. III - 322

1    not guilty.

2         Thank you.

3         THE COURT:  Thank you, Mr. Golden.

4         Mr. DeVillers, Mr. Kelley, is the government ready to

5    proceed with the presentation of its case in chief or are we

6    going -- are we --

7         MR. DEVILLERS:  We scheduled our witnesses to begin

8    tomorrow morning.

9         THE COURT:  All right.

10        Ladies and gentlemen, that will conclude our business

11   for today.  In scheduling, we anticipated that the jury

12   selection would take a little longer than anticipated -- than

13   it actually did.  And so the government has its witnesses

14   scheduled to begin tomorrow morning.

15        So you are going to have an early day today.  I will

16   wish you God's speed going home.  Just drive safely.  We'll

17   look forward to seeing you first thing tomorrow morning.  You

18   should look to get here not later than 8:30.  We hope to begin

19   at 9:00.  We can begin sooner if you get here earlier.  But I

20   recognize that some of you may have children to get to school

21   and those kinds of things.  So until we kind of get our routine

22   down, we will start at nine o'clock.  But, ladies and

23   gentlemen, if you collectively determine that it's easier for

24   you to get here, or as easy for you to get here at 8:30 and be

25   ready to go at 8:45, then we can adjust our schedule

VOL. III - 323

1  accordingly. I just want to be mindful of what you have in the

2  mornings in terms of getting children or other loved ones

3  situated before you come to do work here at the court. So

4  we'll talk more about that tomorrow, but this evening, why

5  don't you ponder that.

6       Remember the Court's admonition not to discuss any

7  aspect of the case or to do any independent research. And

8  other than that, enjoy your evening, ladies and gentlemen.

9     (Jury out at 2:44 p.m.)

10      THE COURT: Mr. DeVillers, anything further from the

11 government?

12      MR. DEVILLERS: There's not, Your Honor, but we will

13 e-mail or get as soon as possible our list of witnesses and

14 schedule to Mr. Golden.

15      THE COURT: Okay. I'll ask that you have that to

16 Mr. Golden by 4:30. It's a quarter till three now.

17      Anything from the defense, Mr. Golden?

18      MR. GOLDEN: No. Thank you, Your Honor.

19      THE COURT: All right.

20     Ms. Clark, you may adjourn court.

21     (Proceedings concluded at 2:46.)

22                                    - - -

23

24

25

VOL. III -  324

1                        C E R T I F I C A T E

2

3           I, Shawna J. Evans, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Algenon L. Marbley, Judge, in the United

6    States District Court, Southern District of Ohio, Eastern

7    Division, on the date indicated, reported by me in shorthand

8    and transcribed by me or under my supervision.

9

10

11                              s/Shawna J. Evans_____
                                Shawna J. Evans, RMR, CRR
12                              Official Federal Court Reporter

13

14                              April 24, 2017

15

16

17

18

19

20

21

22

23

24

25